UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| B.D. by his parents and<br>next friends, RACHEL and<br>MICHAEL DOUCETTE, | )<br>)<br>) | |
| | ) | |
| Plaintiffs, | ) | CIVIL ACTION NO. |
| | ) | 11-10692-DPW |
| v. | ) | |
| | ) | |
| GEORGETOWN PUBLIC SCHOOL<br>DISTRICT and the TOWN OF<br>GEORGETOWN, | )<br>)<br>) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

MEMORANDUM AND ORDER
September 27, 2012

The plaintiffs seek attorneys' fees arising from an essentially unnecessary appeal to the state Bureau of Special Education Appeals and for the litigation of the fee dispute in this Court as well.  The case illustrates the incentive structure attorneys' fees litigation creates for those engaged with the Individuals with Disabilities Act.

The Act encourages collaborative decisionmaking by school administrators and parents in developing an Individualized Education Plan for a student.  While the opportunity for appeal to the state Bureau of Education Appeals and thereafter to the courts assures disinterested enforcement of the Act's directives, it also raises the prospect of attorneys' fee awards to plaintiffs who prevail.  But it is certainly not a goal of the

-1-

Act to increase transaction costs, including attorneys' fees, through formal proceedings. The fundamental goal is rather to fashion an appropriate IEP as expeditiously as possible. Unnecessary transaction costs divert resources from other worthwhile initiatives of parents and schools alike.

Given the emotionally charged circumstances IDEA litigation involves, the pre-litigation collaborative process is subject to heightened tensions and potential breakdown. That is what happened here, where the parents refused even to review the school's developed proposal before initiating a BSEA appeal and, in the course of this litigation, have generated substantial fees to achieve a result obtainable without the litigation process at all.

In administering the Act, courts have an obligation to adjust and calibrate the incentive structure to serve the larger purposes of the Act. In acting on the dispositive motions in this matter, I consider the proper statute of limitations for IDEA attorneys' fees litigation and what constitutes a prevailing party when the degree of success is both marginal and effectively agreed upon by the school. I conclude that a lengthy statute of limitations beyond that customary in Massachusetts for judicial review of administrative proceedings is not called for and indeed would undermine the Act's obvious interest in resolving disputes promptly so that the parties may move on with their affairs.

Consequently, I find this case - initiated some ten months after the administrative decision was rendered - to be time barred. For purposes of completeness, I also conclude, as alternative grounds for denying Plaintiffs relief that while the Plaintiffs might technically and superficially be denominated a prevailing party, the relief obtained before the BSEA did not cause a material change in Georgetown's provision of services under the IDEA and consequently is not entitled to attorneys' fees. Finally, although my alternative conclusions with respect to the statute of limitations and prevailing party status are sufficient to preclude any recovery at all, I outline the approach I would take in assessing attorneys' fees if the claim were not barred by the statute of limitations and the Plaintiffs' failure to establish prevailing party status under the law of attorneys' fees.

## I.  BACKGROUND

A.  Facts

B.D., a minor, by his parents Rachel and Michael Doucette, filed this lawsuit seeking attorneys' fees under the Individuals with Disabilities Act against the Georgetown Public School District and Town of Georgetown (collectively, "Georgetown") where the family resides.

B.D. has been diagnosed with an extremely rare genetic disorder, Chromosome 15q Duplication Syndrome.  Fewer than 500

people in the world carry B.D.'s disorder.  As a result of his
disorder, B.D. has a number of developmental deficits, including
"abnormal social interaction, sensory dysfunction, cognitive
delays, communication deficits, and decreased ability to complete
activities of daily living."

On March 29, 2010, Georgetown met with B.D.'s parents to
develop a new Individualized Education Program (IEP) to meet
B.D.'s needs, because the prior IEP was set to expire on April 1.
At the meeting, B.D.'s parents brought a number of concerns to
Georgetown's attention, including a concern for B.D.'s safety and
a fear that B.D. was not making educational progress.

B.D.'s parents had first become concerned for B.D.'s safety
in 2009, while the prior IEP was in effect.  B.D.'s mother
complained that between October and December 2009, there were
multiple occasions during which she witnessed B.D. on the
school's playground without his aide.  Due to his disabilities,
B.D. has a limited ability to report injury or pain, and has a
high pain threshold, so B.D.'s parents were concerned that
without his aide present at all times, B.D. could sustain an
injury that would go unnoticed.

B.D.'s parents were also concerned that B.D.'s developmental
delays were actually increasing, rather than improving.  B.D.'s
parents based this concern on a comparison between results from a
February 2009 Early Intervention testing and a January 2010

-4-

neuropsychological evaluation at Mass. General Hospital.  B.D.'s teachers and aides disagreed with his parents' concern, based on their experiences with him in the classroom and outside of it while he received additional services.

At the March 29 meeting, two experts---Ms. Gretchen Timmel and a clinical psychologist---gave reports on their observations of B.D.  Ms. Timmel, a certified elementary teacher and licensed educational psychologist at the Massachusetts General Hospital, observed B.D. running out the door of the classroom and into a hallway before being retrieved by his teacher.  She also opined that B.D.'s new IEP should use Applied Behavioral Analysis ("ABA") methodology, and that B.D. should be given individual instruction for thirty minutes, three times per day.

After the experts gave their reports, B.D.'s parents took the position that B.D.'s current placement was inadequate, and requested that he be placed in either a more appropriate in-district or out-of-district placement.

In response to the March 29, 2010 meeting, Georgetown prepared a new IEP.  That IEP proposed that for the 2009-2010 academic year, B.D. stay in his integrated pre-school program, but receive additional individual instruction in the afternoons, including occupational, speech, and physical therapy, motor skills training, home-based services, and six weeks of extended

year services.  B.D. would always be accompanied by an adult aide
while at school.

In the 2010-2011 school year, the new IEP proposed that B.D.
be placed in a substantially-separate[1] six-child classroom with
one special-education teacher and five aides.  B.D. would
continue to receive his additional individual instruction within
the new substantially-separate placement, and would be offered an
additional 30 minutes in an integrated pre-school classroom.  As
with the prior IEP, B.D. would be accompanied by an adult at all
times while at school.

B.D.'s parents did not respond to Georgetown's proposed IEP.

In early May 2010, B.D.'s parents removed him from the
school after B.D. ran from a classroom and in a separate incident
fell off a bean-bag chair and hit his head.  B.D. was not injured
in either incident, but his parents concluded that he was not
safe at school any longer.

On May 27, 2010, Georgetown held a further IEP Team meeting
with B.D.'s parents to discuss the incidents and B.D.'s
placement.  The BSEA hearing officer described the events of that
meeting:

> At the beginning of the meeting, the Georgetown
> Elementary School Principal sought to strike a

_____

[1]  The BSEA Hearing Officer found that there is an acknowledged
typo on the proposed IEP which calls for 80% of B.D.'s program
time to be spent in an inclusory classroom, instead of a
substantially-separate accommodation.

conciliatory tone, hoping to re-establish a positive
relationship with Parents, but by all accounts, the
meeting quickly became contentious.  At this meeting,
Parents took the position that their son had incurred a
substantial head injury at school on May 10th even
though there was no medical support for this position.
When asked to be allowed to see the medical reports
indicating [B.D.]'s injury, Parents refused.  Parents
made it clear that they were no longer willing to meet
with or otherwise try to work out their disagreements
with Georgetown informally, and that their attorney
would be filing a request for hearing with the BSEA for
purposes of addressing their disagreements with
Georgetown.  Father testified that as of May 27th, he
and his wife essentially "gave up" on Georgetown,
believing that Georgetown could not or would not
appropriately and safely educate their son.  Mr.
Dempsey testified that once the meeting became
contentious, it was not possible to discuss [B.D.]'s
placement, with the result that this discussion never
occurred.

What B.D.'s parents apparently did not know at the time was

that in March 2010, Georgetown had received approval and funding

to develop the kind of ABA-based program the experts had opined

at the previous IEP Team meeting B.D. needed.  On July 1, 2010,

approximately one month after the failed May 27, 2010 IEP Team

meeting and two weeks before B.D. filed an appeal with the BSEA,

Georgetown hired Dr. Ali Pedago, a consultant from Melmark (the

school B.D.'s parents wanted to move B.D. to), to develop and

implement an ABA-based Transitions Classroom (also referred to as

the "Preschool Classroom Project") for students like B.D.  As the

BSEA Hearing Officer described it,

With her assistance, Georgetown has been planning for
the development of a substantially-separate, ABA
classroom for pre-school students and 1st graders to
begin for the 2010-2011 school year.  It is not

> disputed that Georgetown has hired appropriate staff
> and has purchased the requisite educational and testing
> resources, and is prepared to begin this classroom on
> the first day of school in September 2010.
> . . .
> Dr. Pedego testified that once the school year
> commences in September 2010, she and Ms. McGinnity and
> their five aides will take approximately two weeks to
> allow the six children (including [B.D.]) scheduled to
> attend the classroom to acclimate to this new program.
> Dr. Pedego and the Georgetown staff will then assess
> each Student using the ABLLS-R test instrument to
> evaluate each child for purposes of understanding
> better how to teach that child using ABA principles.
> Dr. Pedego and Ms. McGinnity will then develop an
> individual program binder for each child, spelling out
> in detail how ABA principles (including data
> collection) will be utilized to teach each part of the
> particular child's curriculum.  The child's IEP would
> be amended through the Team process to reflect this.

By mid-August, Dr. Pedego had prepared a working draft of
the Transitions Classroom which was presented to B.D.'s parents
approximately three days before the scheduled BSEA hearing.  In
that draft, among other things, Dr. Pedego proposed that further
consultation services should be provided by an ABA specialist
"approximately 6-8 hours per week and then tapered to
approximately 2 hours per week, as the program is in place, and
staff have been fully trained."

B.   Proceedings

B.D.'s parents filed an appeal with the BSEA on July 12,
2010, claiming that Georgetown's proposed IEP was inadequate.  In
their appeal, they requested five forms of relief:

1.   Out-of District Placement: Parents request the
     District be responsible for funding 100% of the
     educational cost, which should include

-8-

transportation for [B.D.] to attend Melmark of New England [a state-approved private special education day placement]. . . .

2.  Extended School Year Services: Parents request the District provide extended school year services to [B.D.]. . . .

3.  Individualized Education Program: Parents request District to provide an appropriate and approved IEP in accordance with federal and state law that enables [B.D.] to access his education and acquire the knowledge and skills, including social/emotional development, according to chronological age and development expectation.

4.  Compensatory Services: the Parents request the District provide [B.D.] with compensatory services for the loss of educational services while [B.D.] was kept home due to the unsafe environment of the District and lack of educational and related services.

5.  Attorney's fees: Parents request the District pays the fees of the Attorney that has represented [B.D.] in the disputed matter.

The BSEA held a hearing on August 24, 25, and 26, 2010. After evaluating all of the evidence, including numerous reports and three days of oral testimony and argument, on September 9, 2010 the BSEA issued its decision.  The written opinion rejected all of B.D.'s parents' claims save for their request for an appropriate IEP.

As to that claim, the BSEA found that "Georgetown's proposed IEP is not appropriate, and therefore, Parents were justified in rejecting the IEP at the time that it was prepared.  I further find, however, that for purposes of providing [B.D.] with appropriate special education and related services and placement

prospectively, Georgetown's proposed IEP can be made appropriate" based on the fact that Georgetown had already hired Dr. Pedego and it was undisputed that her ABA-based Transitions Classroom would be ready by the first day of school in September 2010.  The hearing officer found that the IEP would be appropriate if it was amended "to include two hours per week of consultation services from an ABA specialist, and by re-drafting the IEP to reflect ABA principles, particularly with respect to addressing [B.D.]'s behavior deficits, daily living skills such as toileting, and other areas where individual instruction is called for using ABA methodology."  The re-drafting process was to be completed in accordance with Dr. Pedego's pre-existing plan for the Transitions Classroom.

On April 22, 2011, 225 days after the BSEA decision, B.D.'s parents filed this case seeking attorneys' fees under the Individuals with Disabilities Education Act.  Georgetown filed a motion to dismiss the complaint as barred by the statute of limitations.  It also filed a motion for summary judgment on the merits, claiming that because B.D.'s recovery was so narrow, his parents were not a prevailing party entitled to attorneys' fees under the statute.  B.D. moved for partial summary judgment, seeking a declaration that B.D. was the prevailing party and is entitled to attorneys' fees.

## II.  MOTION TO DISMISS

A.  <u>Standard of Review</u>

A district "court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon* v. *King & Spalding*, 467 U.S. 69, 73 (1984).

B.  <u>Discussion</u>

Georgetown moved to dismiss B.D.'s claim for attorneys' fees on the ground that it was filed outside of the statute of limitations.  Georgetown sought to have the court apply the 90-day statute of limitations from 20 U.S.C. § 1415(i)(2).  In opposing Georgetown's motion to dismiss, B.D. would have this court apply a three-year statute of limitations borrowed from the Massachusetts Tort Claim Act for tort claims against state entities.  Although I indicated at the motion hearing in this matter that I would deny the motion to dismiss, after reflection I decline to apply either proposed limitations period but choose instead the 30 day period for review of state administrative proceedings, and accordingly will grant the motion to dismiss, albeit on a different theory than that pressed by Georgetown.

1.   *90-day Statute of Limitations from 20 U.S.C. § 1415*

Georgetown claims that the 90-day statute of limitations in 20 U.S.C. § 1415(i)(2) bars B.D.'s claim for attorneys' fees.

-11-

Section 1415(i)(2) provides in relevant part that "[a]ny party aggrieved by the findings and decision made . . . under this subsection . . . shall have 90 days from the date of the decision of the hearing officer to bring such an action . . . ." 20 U.S.C. §§ 1415(i)(2)(A) & (B).[2] Section 1415(i)(3)(B) governs the award of attorneys' fees "[i]n *any* action or proceeding brought under *this section*" and provides that "the court, in its discretion, may award attorneys' fees as part of the costs" to a prevailing party. 20 U.S.C. § 1415(i)(3)(B) (emphases added).

Georgetown contends that because reasonable attorneys' fees are available "[i]n any action or proceeding brought under" § 1415, and § 1415(i)(2) provides a 90-day window "to bring a civil action with respect to the complaint presented pursuant to this section," then the 90-day statute of limitations should apply to actions for attorneys' fees. The statutory language, however, is not clear and the legislative history of the 2004 amendment to the IDEA which created the 90-day limitation in § 1415(i)(2) suggests that time limit applies only to due process appeals to federal court under § 1415(i)(2), and does not extend to fee actions under § 1415(i)(3). *See* S. Rep. No. 108-185, at

_____

[2]  It also provides that if "the State has an explicit time limitation" for appealing an adverse decision, then that time limit should be used. 20 U.S.C. § 1415(i)(2)(B). Massachusetts does not have an explicit time limit, so the 90-day default limit in § 1415(i)(2)(B) would apply to an appeal on the merits of the BSEA Hearing Officer's decision.

37 (2003) (explaining that § 1415(i)(2)(B) "gives a party 90 days from the date of the decision of the hearing officer for appealing *a due process hearing decision* to State or federal district courts, or if there is an explicit State time limitation set out by State statute or regulation, in such time as the State law allows." (emphasis added)).  Therefore, because there is no clear statute of limitations which applies to attorneys' fees actions under § 1415(i)(3), I must look to the most analogous state statute of limitations.

   2.  *Analogous State Statutes of Limitations*

   Where no federal statute of limitations is provided, federal courts adopt the most analogous state statute of limitations in the forum state.[3] *Wilson* v. *Garcia*, 471 U.S. 261, 266-67 (1985) (superceded on other grounds by statute).  A federal court deciding the proper statute of limitations must undertake a three part analysis.  First, a court looks to "whether state law or federal law governs the characterization of [the claim] for statute of limitations purposes." *Id.* at 268.  Next, if federal law applies, a court must decide whether all such claims "should

---

[3] For example, prior to the enactment of the current 90-day statute of limitations in § 1415(i)(2)(B), no statute of limitation was specified for appeals of a BSEA Hearing Officer's decision.  The First Circuit adopted the 30-day statute of limitations from the Massachusetts Administrative Procedure Act as the most analogous state statute of limitations to govern the civil action authorized by § 1415(i)(2).  *Amann* v. *Town of Stow*, 991 F.2d 929, 932 (1st Cir. 1993).

be characterized in the same way, or whether they should be evaluated differently depending upon the varying factual circumstances and legal theories presented in each case." *Id.* Last, a court "must characterize the essence of the claim in the pending case, and decide which state statute provides the most appropriate limiting principle." *Id.*

Under the IDEA as it relates to fee actions, state law governs the characterization of the statute of limitations. *Cf. id.* at 269 (noting that in actions for fees for section 1983 claims, under the first prong "[o]nly the length of the limitations period, and closely related questions of tolling and application, are to be governed by state law."). Accordingly, I will apply the most analogous state statute of limitations to B.D.'s complaint.

> a)   Circuit Split

There is a clear split in the circuits as to the source of the most analogous state statute of limitations for fee actions under the IDEA. For its part, however, the First Circuit has not yet found it necessary to weigh in definitively on the matter. *See Nieves-Marquez* v. *Puerto Rico*, 353 F.3d 108, 119 (1st Cir. 2003) (declining to address the issue because even under the shortest statute of limitations, the plaintiffs' claims were timely).

In the alignments which form the split among circuits other than the First, the Eleventh Circuit on one side of the divide has held that §§ 1415(i)(2) and 1415(i)(3) provide separate procedures which, in turn, demand separate statutes of limitations.  The Eleventh Circuit chose not to borrow a state statute of limitations governing judicial review of administrative decisions:  "[T]he short statute of limitations associated with appeals of administrative procedures, while appropriate when a child's Individualized Education Plan is at issue in a substantive appeal of an administrative determination, are too short to vindicate the underlying federal policies associated with the fee-claims provisions of the IDEA." *Zipperer* v. *Sch. Bd. of Seminole Cnty.*, 111 F.3d 847, 851 (11th Cir. 1997).  Seeking fees in the district court, the Eleventh Circuit reasoned, is not akin to an appeal of an agency decision, because "the district court, rather than the administrative agency, has jurisdiction to award fees." *Id.*

Although the Ninth Circuit has not expressly joined the Eleventh Circuit in characterizing the attorneys' fees action as separate from the underlying administrative proceeding under the IDEA, the trend in that circuit's caselaw suggests that if presented with an appropriate case, it would side with the Eleventh Circuit.  In *P.N.* v. *Seattle School District*, for example, the Ninth Circuit held "that the IDEA authorizes an

action solely to recover attorneys' fees and costs, even if there has been no administrative or judicial proceeding to enforce a student's rights under the IDEA." *P.N.* v. *Seattle Sch. Dist.*, 474 F.3d 1165, 1169 (9th Cir. 2007).  Thus, the Ninth Circuit allowed an independent action for attorneys' fees to proceed against the Seattle School District.  This suggests that, like the Eleventh Circuit, the Ninth Circuit views actions to recover fees under the IDEA as independent from the underlying case resolving the conflict between the district and the child's parents.

On the other side of the divide, the Sixth, Seventh, and D.C. Circuits have chosen state statutes of limitations applicable to requests for judicial review of administrative decisions as the applicable statute of limitations for an action to recover fees under the IDEA.  These circuits reason that claims for fees are ancillary to the judicial review of the administrative hearing, therefore they should be governed by the analogous statutes of limitations for judicial review of administrative actions.  *Kaseman* v. *District of Columbia*, 444 F.3d 637, 641-42 (D.C. Cir. 2006) (recognizing the two views in the circuit split and finding that the best way to reconcile them is to treat "a prevailing party's fee request as part of the same 'action' as the underlying educational dispute, despite being brought pursuant to an independent 'cause of action.'"); *King* v.

-16-

*Floyd Cnty. Bd. of Educ.*, 228 F.3d 622, 625-26 (6th Cir. 2000);

*Powers* v. *Indiana Dep't of Educ.*, 61 F.3d 552, 555 (7th Cir.

1995).

The D.C. Circuit summarized the tension between the

competing viewpoints:

> The IDEA makes an agency responsible for a child's
> evaluation and educational placement, not for granting
> fees, which are awarded in the discretion of the
> district court.  A fee request is therefore not a
> direct appeal of a decision made by the agency at the
> administrative hearing, as it does not call into
> question the child's evaluation or placement.  Yet the
> parent's entitlement to fees arises out of the same
> controversy and depends entirely on the administrative
> hearing for its existence.

*Kaseman*, 444 F.3d at 642.  The D.C. Circuit concluded that

because the entitlement to fees most frequently comes into

existence as a result of the administrative hearing, the better

analytical approach is to apply the statute of limitations for

judicial review of administrative decisions.  *Id.*

b)   First Circuit Context

Although the First Circuit has not taken a position on the

issue, it has identified "three IDEA policy goals" for a district

court to consider in resolving a dispute over the proper state

statute of limitations applicable to IDEA attorneys' fees

disputes:  "the parental interest in participation, the school's

interest in speedy resolution of disputes, and the child's

interest in receiving education entitlement."  *Nieves-Marquez*,

353 F.3d at 119.

Judge Zobel has found that under the First Circuit's three policy goals, the three-year statute of limitations provided by Massachusetts General Laws chapter 258 section 4 for tort claims against state entities under the Massachusetts Tort Claims Act is more appropriate than the 30-day statute of limitations provided for judicial review of state administrative decisions under Mass. Gen. Laws ch. 30A § 14.  *See Anthony F.* v. *Sch. Comm. of the City of Medford*, No. Civ.A. 04-10610-RWZ, 2005 WL 1262090, at *2 (D. Mass. Apr. 22, 2005).  Judge Zobel's analysis would have the First Circuit join the Eleventh and Ninth Circuits.  As will appear below, I do not adopt Judge Zobel's approach because I believe the First Circuit's policy goals point toward the shorter statute of limitations applicable to judicial review of administrative agency decisions.

        c)   Application

As a general matter, an action in tort is an imperfect analogue for a suit for attorneys' fees, so I decline to adopt *Anthony F*'s finding that the Massachusetts Tort Claims Act provides the most analogous statute of limitations.  Thus, I look to the other possible analogous Massachusetts statutes of limitations.  One potential statute is § 5B of Mass. Gen. Laws ch. 260, which provides a three-year statute of limitations for "[a]ctions *arising on account of* violations of *any* law intended for the protection of civil rights, including but not limited to

-18-

actions alleging . . . discrimination on the basis of . . . handicap."  Mass. Gen. Laws ch. 260 § 5B (emphasis added).

Prior to the 2004 amendments to the IDEA which created a 90 day limitation period for actions under § 1415(i)(2), the First Circuit, in the context of deciding the proper statute of limitations for an IDEA claim for compensatory education, noted that such claims were "similar to a civil rights action," and expressed a preference for using a civil-rights statute of limitation.  *Murphy* v. *Timberlane Reg'l Sch. Dist.*, 22 F.3d 1186, 1193 (1st Cir. 1994) (analogizing an IDEA compensatory education claim to a civil rights claim, but applying a personal injury statute of limitations because New Hampshire did not have a civil rights action statute and civil rights actions traditionally borrowed the statute of limitations from personal injury actions).  In the "compensatory education" context, the BSEA has also chosen to apply the Massachusetts statute of limitations for civil rights actions to an IDEA complaint, though that would not apply here because B.D. did not have a successful compensatory claim below.  *See Student* v. *Fall River Pub. Schs.*, BSEA No. 00-0771 (Dec. 23, 1999).

Nevertheless, a civil rights action is no more precise an analogue for an IDEA fee suit than an action in tort is.  The most analogous state statute of limitations is the 30-day limit

-19-

provided by the Massachusetts Administrative Procedures Act, which governs judicial review of agency actions.

Before the IDEA was amended to provide a 90-day statute of limitations for federal court review of a BSEA Hearing Officer's decision, it was silent as to the proper statute of limitations period for a substantive review of the BSEA's decision.  The First Circuit at that point concluded that the most analogous state statute of limitations for an appeal on the merits of the BSEA's decision was provided by the Massachusetts Administrative Procedures Act, Mass. Gen. Laws ch. 30A § 14, which required that federal court actions challenging an agency's decision be filed within 30-days of receipt of notice of the agency's decision. *Amann* v. *Town of Stow*, 991 F.2d 929, 932 (1st Cir. 1993).

The First Circuit found that a 30-day statute of limitations was consistent with "[t]he legislative history, statutory terms, and regulatory framework of the IDEA [which] all emphasize promptness as an indispensable element of the statutory scheme." *Id*.  It also found that any harsh side effects of a short limitations period were substantially limited.  For example, because "the IDEA instructs school authorities to give parents notice 'of all procedures available pursuant to this section,'" which several courts had interpreted to include any applicable limitations period, then parents would be substantially less likely to lose their right to judicial review because they were

ignorant of the statute of limitations.  *Id.*  Furthermore, unlike the heavy burdens of investigation and research that the decision to file a lawsuit traditionally entails, the court noted that the only action parents had to take within the thirty day limitations period was to decide whether to sue in federal court over a completed administrative record.  *Id.* at 933.

While the First Circuit's decision has effectively been superceded by the amendment to § 1415(i)(2) which added the 90 day statute of limitations, its reasoning shapes my analysis of the three IDEA policy goals in this context.  The first policy goal, the parental interest in participation, is not affected by a shorter statute of limitations because unlike the substantive appeal process, an action for attorneys' fees will necessarily be filed only by parents represented by counsel.  The second policy goal, the school's interest in speedy resolution of disputes, is substantially furthered by a shorter statute of limitations.  If the goal is to resolve a dispute in an expeditious manner, then a 30-day statute of limitations is far more effective than a lingering three year statute of limitations under either the tort theory approach of *Anthony F.* or the civil rights action analogue discussed above.  Finally, the third policy goal, the child's interest in receiving education entitlement, is unaffected by a 30-day statute of limitations for recovery of attorneys' fees. Only prevailing parties are entitled to attorneys' fees under the

statute, 20 U.S.C. § 1415(i)(3), and therefore by the time the attorneys' fees dispute becomes ripe, the child will have already received a decision regarding whatever educational benefits he or she is entitled to receive.

Adopting the 30-day statute of limitations from the Massachusetts Administrative Procedures Act also reflects the reality of the attorneys' fees practice in federal court. Actions to recover attorneys' fees are ancillary to the administrative action; without the administrative action, no attorneys' fees award would be possible.  Thus, although a suit for attorneys' fees may be a separate cause of action, the basis for that suit and its genesis are in the substantive decisions of the agency below.  The 30-day statute of limitations applicable to judicial review of agency actions thus seems to be the most appropriate of available analogues.  See, e.g., *Kaseman*, 444 F.3d at 641-42; *King*, 228 F.3d at 625-26; *Powers*, 61 F.3d at 555.

There is no good reason why the statute of limitations for an action to recover fees that depend upon an agency's decision, should be longer than an appeal of the merits of the decision itself.  I am also mindful of the fact that in federal court, unless a statute or a court's local rules provide otherwise, a claim for attorneys' fees must be filed within 14 days after the entry of judgment.  Fed. R. Civ. P. 54(d)(2)(B)(i).

Therefore, I adopt the 30-day statute of limitations for judicial review of administrative actions under Mass. Gen. Laws ch.30A § 14 as the most analogous state statute of limitations. Under that statute, B.D.'s suit for fees was untimely, and is barred.

### III.   MOTIONS FOR SUMMARY JUDGMENT

A.   Standard of Review

A movant is entitled to summary judgment when it "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A dispute is genuine if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party," and "[a] fact is material if it has the potential of determining the outcome of the litigation." *Farmers Ins. Exch.* v. *RNK, Inc.,* 632 F.3d 777, 782 (1st Cir. 2011) (citation omitted).  However, "conclusory allegations, improbable inferences, and unsupported speculation" are insufficient to create a genuine issue of material fact to survive summary judgment. *Sullivan* v. *City of Springfield*, 561 F.3d 7, 14 (1st Cir. 2009) (quotation and citation omitted).  I "view the facts in the light most favorable to the party opposing summary judgment." *Rivera–Colón* v. *Mills,* 635 F.3d 9, 10 (1st Cir. 2011).  Because I am faced with what are essentially (though not styled as such) cross-motions for summary judgment, I "must

-23-

view each motion, separately, through this prism." *Estate of Hevia* v. *Portrio Corp.*, 602 F.3d 34, 40 (1st Cir. 2010).

B.   Georgetown's Motion for Summary Judgment

Georgetown moves for summary judgment claiming that B.D.'s parents were not a prevailing party, and even if they were, their success was so limited that they should not be entitled to fees under the IDEA.

Under the IDEA, only a "prevailing party" is entitled to an award of attorneys' fees.  20 U.S.C. § 1415(i)(3)(B)(i) ("In any action or proceeding brought under this section, the court, in its discretion, may award reasonable attorneys' fees as part of the costs . . . to a prevailing party who is the parent of a child with a disability.").  The Supreme Court has concluded that a party is considered to have prevailed if he obtained a "material alteration of the legal relationship of the parties" along with some "judicial *imprimatur* on the change." *Buckhannon Bd. & Care Home, Inc.* v. *West Virginia Dept. of Health & Human Res.*, 532 U.S. 598, 604-05 (2001) (emphasis in original); *Doe* v. *Boston Pub. Schs.*, 358 F.3d 20, 29-30 (1st Cir. 2004) (holding that *Buckhannon* applies to awards of attorneys' fees under the IDEA).  Judgments on the merits or court-ordered consent decrees are sufficient to show the necessary judicial imprimatur. *Buckhannon*, 532 U.S. at 605.

Georgetown submits two theories under which B.D.'s parents are not entitled to attorneys' fees: (1) they are not a prevailing party because either (a) they "did not obtain the relief they sought on any of their claims," or (b) any relief they did obtain did not effect a material alteration in their legal relationship with Georgetown; and (2) even if they prevailed, B.D.'s parents' recovery was so minimal as to not warrant an award of attorneys' fees.

    1.   *Prevailing Party*

        a)   Obtained Relief

Georgetown's first claim, that B.D.'s parents did not obtain the relief they sought, is not entirely accurate.  Georgetown relies on *Kathleen H.* v. *Mass. Dep't of Educ.*, 154 F.3d 8 (1st Cir. 1998) in support of its argument.  There, the First Circuit found that a district court did not abuse its discretion in denying attorneys' fees to a student's parents whose main goal was to be reimbursed for the costs of their unilateral decision to place the student in a private school.  *See id.* at 14-15 & n.5.  The BSEA found that the student's public school was capable of meeting his needs and any errors it made in his IEP did not rise to the level of noncompliance.  The BSEA denied the student's parents' request for reimbursement.  *Id.* at 12.  Thus, although the BSEA made minor drafting modifications to the

student's IEP to fix some errors, the student's parents did not
prevail in more than a de minimis sense.  *Id.* at 15.

Georgetown argues that, like the parents in *Kathleen H.*,
B.D.'s parents "sought (1) an out-of-district placement; (2)
compensatory services; and (3) extended school year services.
The only relief granted to [B.D.'s parents] was neither sought by
[them] nor a significant claim in the litigation."  However,
B.D.'s parents requested five forms of relief, two of which are
omitted by Georgetown in the recitation.  In particular, B.D.'s
parents' third requested form of relief read as follows:

> Individualized Education Program: Parents request
> District to provide an appropriate and approved IEP in
> accordance with federal and state law that enables
> [B.D.] to access his education and acquire the
> knowledge and skills, including social/emotional
> development, according to chronological age and
> development expectation.

As a part of this request, B.D.'s expert suggested that ABA
methodology be applied to B.D.'s IEP.  As a formal matter, B.D.
may be said to have prevailed in seeking this relief.

The BSEA found that "Georgetown's proposed IEP is not
appropriate, and therefore, Parents were justified in rejecting
the IEP at the time that it was prepared."  It found that the IEP
would be appropriate if it were amended "to include two hours per
week of consultation services from an ABA specialist, and by re-
drafting the IEP to reflect ABA principles, particularly with
respect to addressing Student's behavior deficits, daily living

skills such as toileting, and other areas where individual instruction is called for using ABA methodology." Thus, contrary to Georgetown's contention, B.D.'s parents sought relief in the form of an appropriate IEP, and the BSEA decision awarded them that relief in the form of an IEP modified to reflect ABA principles. Consequently, Georgetown's claim that B.D.'s parents "did not obtain the relief they sought on any of their claims" fails as a formal matter.

> b)   Material Alteration of Relationship

Georgetown's second claim is that the BSEA's decision did not bring about a material change in its relationship with B.D. Georgetown argues that because it "had already stated its intent to provide [B.D.] with ABA consultation services and already planned to redraft [B.D.]'s IEP in accordance with ABA principles," the BSEA's decision requiring Georgetown to do so did not materially affect the parties' relationship.

Of course, the BSEA hearing officer ordered an amended IEP including "two hours per week of consultation services from an applied behavior analysis (ABA) specialist, and . . . incorporat[ing] and reflect[ing] ABA principles, particularly where intervention or instruction is called for utilizing ABA methodology," and that the re-drafting process should be consistent with Dr. Pedego's Transitions Classroom plan. Georgetown correctly contends, however, that by the time of the

hearing, it had already begun to do all of the things the hearing officer later said were necessary, and that consequently the hearing officer's decision did not affect a material change in the parties' relationship.

Georgetown notes that before B.D.'s parents had even filed a notice of appeal with the BSEA, it had already contracted with an ABA consultant to design an appropriate program for the 2010-2011 year.  In an e-mail on August 4, 2010, the Coordinator of Program Services for Melmark New England, the ABA consultant's institution, noted that the consultant was at that time working on designing a full ABA model class to be led by an experienced and certified ABA teacher.

In fact, the consultant, Dr. Pedego, had already prepared a working draft of the Transitions Classroom which was provided to B.D.'s parents three days before the BSEA hearing.  In that draft she proposed, among other things, that further consultation services should be provided by an ABA specialist "approximately 6-8 hours per week and then tapered to approximately 2 hours per week, as the program is in place, and staff have been fully trained."  The proposed classroom design would include a full-time teacher with two-to-three years of experience employing an ABA model for children with autism.  Dr. Pedego recommended that the teachers adopt "strategies based on the principles of Applied Behavior Analysis (ABA)," focusing "on skill acquisition through

repeated practice, and generalization of acquired skills across varied people, places, materials, and activities." It also proposed that teachers adopt strategies to assist "students to develop the skills necessary to be successful learners in typical elementary classroom settings," working alongside with speech, occupational, and physical therapists.

The BSEA hearing officer recognized that "[b]oth parties believe that it is appropriate for [B.D.]'s educational program to utilize ABA principles of instruction . . . and that these principles should be integrated into [B.D.]'s IEP." Georgetown had begun to do so before the BSEA proceedings commenced. The BSEA hearing officer required that the IEP redrafting "occur consistent with Dr. Pedego's testimony . . . subsequent to the Assessment of Basic Language and Learning Skills . . . evaluation" which was projected to be "completed within approximately ten weeks after the beginning of the 2010-2011 school year." The hearing officer did so with recognition that Georgetown had already "engaged in a planning process . . . to develop the kind of ABA program recommended" for B.D. and further recognized the steps that were being taken to provide adequate ABA-recommended teaching strategies, support, and staffing for B.D. and his classmates.

Georgetown thus argues that because the hearing officer recognized that all of the things he held were deficient about

B.D.'s IEP were at least planned or underway at Georgetown, the hearing officer's decision did not affect a material change in the relationship between the parties.  In this connection, Georgetown primarily relies on a case from the District of Connecticut, *R.L. ex rel. Mr. L.* v. *Plainville Board of Education,* 363 F. Supp. 2d 222, 239 (D. Conn. 2005), in support of its contention.

In *R.L.*, the hearing officer denied seven of the parents' eight requested forms of relief.  *Id.* at 238.  The only ways in which the parents were successful were the hearing officer's (1) technical amendments to R.L.'s hourly schedule, and (2) "direction to amend [R.L.]'s IEP to incorporate an audiological plan."  *Id.* at 239.  The technical amendments were de minimis, so the district court declined to award attorneys' fees for them. *Id.*  The district court went on to find that the hearing officer's direction to amend the IEP to incorporate an audiological plan was also insufficient to warrant an award of attorneys' fees under the IDEA, because the school district included its intention to provide those services in the draft IEP with a note "that a full plan would be developed over the summer."  *Id.*  The district judge found that, "[g]iven the record, there is no reason to believe that [the school district] would not have instituted an audiological plan but for the decision of the hearing officer."  *Id.*  But-for causation between

-30-

the hearing officer's actions and the child's benefits was found to be missing, and therefore the parents could not show that the hearing officer caused a material change in the relationship of the parties. *Id.*

Likewise here, before B.D.'s parents filed an appeal with the BSEA, Georgetown had hired an ABA consultant to create a plan encompassing all of the changes the hearing officer subsequently ordered. Georgetown had already planned to re-draft B.D.'s IEP; as the hearing officer recognized, Dr. Pedego had drafted a plan that Georgetown was adopting which called for a new IEP to be developed within the first ten weeks of the 2010-2011 school year. The hearing officer's opinion made explicit that the new IEP was to "occur consistent with Dr. Pedego's testimony," which was that "this process would likely be completed within approximately ten weeks after the beginning of the 2010-2011 school year." And Dr. Pedego's Transitions Classroom plan called for six to eight hours of consultation services with an ABA specialist, tapering down to two hours, which was more than the BSEA Hearing Officer ultimately ordered.

Indeed, in every relevant respect, Dr. Pedego's plan encompassed the very changes the Hearing Officer ordered were necessary. Thus, as in *R.L.*, the plaintiff's request for attorneys' fees will be denied because the hearing officer's

opinion did not cause a material change in the legal relationship of the parties.

### 2.   Minimal Relief

Even if I were to find that the hearing officer's decision created a material change in the legal relationship between the parties, Georgetown argues that the relief B.D. obtained was so minimal that it does not warrant the reimbursement of B.D.'s attorneys' fees, or alternatively that if it does, the amount of fees should be substantially reduced.  I agree.

When analyzing a claim for attorneys' fees, a court engages in a two step inquiry.  First, as I have done above, the court asks whether the plaintiff is entitled to any fees.  If the answer is yes, then the question becomes "what percentage of their attorneys' reasonable fees should be awarded[?]"  *Claudia C-B* v. *Bd. of PVPA Char. Sch.*, 539 F. Supp. 2d 474, 486-87 (D. Mass. 2008).  In *Claudia C-B*, Judge Ponsor (adopting the report and recommendations of Chief Magistrate Judge Neiman) canvassed the spectrum of attorney fee reductions in the First Circuit and elsewhere.  *Id.* at 487-88.  I now turn to that spectrum to determine whether a reduction of fees is warranted in this case.

On one end of the spectrum, courts have denied all attorneys' fees where the parents achieved only marginal success. For example, the court in *Bristol Warren Regional School Commission v. Rhode Island Department of Education*, 253 F. Supp.

2d 236, 243 (D.R.I. 2003), denied attorneys' fees where the parents obtained limited relief in the form of an annual IEP meeting, when their stated overall goal was to have their daughter receive appropriate services in a parochial school. *Kathleen H.*, the case cited by Georgetown for the proposition that de minimis success is insufficient to warrant prevailing-party status, also falls on this end of the spectrum. 154 F.3d at 15.

At the other end of the spectrum, courts have awarded a percentage of fees commensurate with the plaintiffs' degree of success, up to 100% of the requested amount. This representative percentage approach was taken by Judge Ponsor in *Claudia C-B*. In *Claudia C-B*, the parents succeeded on, at most, one out of their eight claims. 539 F. Supp. 2d at 488. Judge Ponsor chose to award the parents one-eighth, or 12.5%, of their claimed attorneys' fees, because he concluded the degree of success obtained was the single most important factor to be considered. *Id.* (reciting facts and holding of *Mrs. M.* v. *Tri-Valley Cent. Sch. Dist.*, 363 F. Supp. 2d 566 (S.D.N.Y. 2002)).

If I were to find that B.D.'s parents obtained relief, then here, as in *Claudia C-B*, it would only have been on one of their four substantive requests for relief.[4] Thus, even if I were to

---

[4] They also requested their attorneys' fees, which were not granted. However, because I now award them a portion of their fees under the IDEA, I do not count their rejected request for

award attorneys' fees, I would only do so commensurate with

B.D.'s degree of success on the merits.

To measure the degree of success B.D.'s parents attained on

the merits, I requested supplemental briefing from them detailing

the differences between Georgetown's proposed IEP and the re-

drafted IEP ordered by the BSEA Hearing Officer.  I noted that

the briefing should give specific details about what services,

training, and benefits B.D. would receive under the re-drafted

IEP that he would not have received under the proposed IEP.  The

plaintiffs provided a spreadsheet detailing every word and phrase

that changed between the drafts, but they did not draw my

attention to the specifics I requested.

After conducting my own search and review of the record, it

appears that the only meaningful difference[5] between the proposed

IEP and the re-drafted IEP is the adjustment of B.D.'s program

time from 27 hours per week to 30 hours per week.  This increase

is roughly commensurate with the Hearing Officer's order that

---

attorneys' fees before the BSEA to foreclose their entitlements
on attorneys' fees through this action.

[5]  The new IEP also included a number of language changes to
reflect that it incorporated ABA principles.  However, the
inclusion of ABA principles was agreed upon by the parties as far
back as the March 2010 IEP meeting.  The Hearing Officer's order
thus cannot be said to have caused the inclusion of the ABA
principles, when Georgetown had already agreed to do so.  *Cf.*
*R.L. ex rel. Mr. L.* v. *Plainville Bd. of Ed.*, 363 F. Supp. 2d
222, 239 (D. Conn. 2005) (denying fees because school district
had already planned to include change required by Hearing Officer
at the basis of the plaintiff's case).

B.D. be provided with two additional hours of consultation services with an ABA specialist per week, and is actually less than that provided by Dr. Pedego's Transitions Classroom plan proposed before the BSEA hearing, which called for consultation services with an ABA specialist for six to eight hours per week initially, tapering to two hours per week.

By the time of the BSEA hearing, at which point B.D.'s parents had already received a copy of Dr. Pedego's proposed Transitions Classroom plan, Georgetown had already offered them everything that they ultimately attained from the Hearing Officer.  At that point, the plaintiffs attorneys' fees were $23,118.75, an amount that would in the best of circumstance be reduced to reflect B.D.'s relatively modest degree of success on the merits.  If I were to grant fees, I would reduce their fee request to $2,500 under my equitable powers, reflecting B.D.'s parents' very modest degree of success on the merits.

C.   Plaintiffs' Partial Motion for Summary Judgment

The plaintiffs filed their own motion for summary judgment, which in effect is a cross-motion for partial summary judgment on the question whether they are a prevailing party.  For the reasons noted above, I find that they are not.  Accordingly, I deny their motion for summary judgment.  Even if I found that they were a prevailing party, as noted above, I would limit such an award to $2,500.

The plaintiffs also seek their attorneys' fees and costs expended litigating this dispute in federal court.  Through March 7, 2012, they sought an additional $34,650.00 in attorneys' fees. In *Claudia C-B*, Judge Ponsor reduced the plaintiffs' attorneys' fees request for the federal action by the same percentage he reduced the award of attorneys' fees incurred in the underlying BSEA action.  539 F. Supp. 2d at 488.  Likewise, if I were to find B.D. to be a prevailing party entitled to fees, I would reduce the award of fees for this federal action by the same percentage I reduced the fees incurred in the BSEA proceedings. As noted above, I would have awarded $2,500 out of the $39,262.50 in fees being requested for the BSEA proceedings, or approximately 6.4%.  I therefore would award 6.4% of B.D.'s requested attorneys' fees for this federal action, or $2,217.60, for a total fee award of $4,717.60.

## IV.   CONCLUSION

For the reasons set forth above, I (1) GRANT Georgetown's motion to dismiss (Dkt. No. 11).  In the alternative, I (2) GRANT Georgetown's motion for summary judgment (Dkt. No. 15); and correlatively (3) DENY B.D.'s motion for partial summary judgment (Dkt. No. 16).


*/s/ Douglas P. Woodlock*
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE